UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|   |   |
|---|---|
| IN RE: ) | |
| GUANTANAMO BAY ) | Misc. No. 08-442 (TFH) |
| DETAINEE LITIGATION ) | |
| ) | |

### DECLARATION OF GREGORY G. KATSAS

Pursuant to 28 U.S.C. § 1746, I, Gregory G. Katsas, hereby declare:

1. I am the Assistant Attorney General for the Civil Division of the United States Department of Justice ("DoJ"). In that capacity, I am responsible for overseeing all litigation that falls within the jurisdiction of the Division, as generally described in 28 C.F.R. § 0.45. I have held supervisory positions in the Civil Division or the Office of the Associate Attorney General ("OASG"), which oversees the Civil Division, since June 2001.

2. The Civil Division is responsible for defending the Government in habeas corpus cases brought by or on behalf of individuals detained as enemy combatants by the United States Department of Defense ("DoD") at Guantanamo Bay, Cuba. The first of these cases was filed in 2002. Cases filed by or on behalf of over 250 Guantanamo detainees are currently pending before various judges of this Court.

3. Until recently, the parties have had no occasion to litigate the merits of these cases. Initially, the litigation focused on whether the general habeas corpus statute, 28 U.S.C. § 2241, creates statutory jurisdiction over claims filed by the Guantanamo detainees. The lower courts held that it does not, but the Supreme Court ultimately held that it does. See *Rasul v. Bush*, 542 U.S. 466 (2004). Following *Rasul*, the litigation focused on the Government's motions to dismiss on other, purely legal grounds. One judge granted such motions in their entirety, see


*Khalid v. Bush*, 355 F. Supp. 2d 311 (D.D.C. 2005), while another judge granted them only in part, see *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005). Merits proceedings in this Court were stayed during the ensuing appeals. Following initial briefing and argument in those appeals, the D.C. Circuit ordered one additional oral argument, and three rounds of supplemental briefing, to address the impact of one intervening Supreme Court decision and two intervening statutes. Ultimately, the D.C. Circuit held that the Military Commissions Act of 2006 validly repealed this Court's habeas jurisdiction with respect to the Guantanamo detainees, see *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007), but the Supreme Court then reversed that decision, see *Boumediene v. Bush*, 128 S. Ct. 2229 (2008).

    4. Until the Supreme Court decision in *Boumediene*, the Civil Division could take only limited steps to prepare for the defense of claims by the Guantanamo detainees. Under the holding of the D.C. Circuit, those claims would have been reviewed in the first instance by the D.C. Circuit, based on administrative records created by military tribunals, under the standards of review specified in the Detainee Treatment Act of 2005 ("DTA"). In contrast, under the holding of the Supreme Court, the Guantanamo detainee litigation is proceeding in district-court habeas actions, with the parties allowed to submit evidence beyond what was previously presented to military tribunals. In anticipation of the Supreme Court's *Boumediene* decision, the Civil Division secured a significant supplemental appropriation to fund the anticipated increased demands of the Guantanamo litigation. But until *Boumediene* was decided, the Division could not know whether to prepare for hundreds of appellate proceedings in the D.C. Circuit under the DTA (to be handled primarily by or under the supervision of our Appellate Staff) or hundreds of

district-court habeas proceedings in this Court (to be handled primarily by or under the supervision of our Federal Programs Branch).

5. After *Boumediene* was decided, DoJ moved quickly to secure the tangible and human resources necessary to handle the habeas litigation with expedition. As the Court is aware, by the end of June, we had committed to dedicating at least 50 attorneys to the litigation. That commitment in turn necessitated securing at least 30 detailees from outside the Civil Division, including from other litigating divisions within Main Justice and from United States Attorneys' Offices throughout the country. During my seven years in the Civil Division and OASG, I am unaware of any litigation matter in which any Assistant Attorney General has ever requested so many additional resources from outside his or her Division. Nonetheless, the Deputy Attorney General immediately approved my request, and a Department-wide initiative was undertaken to identify an appropriate team of attorneys, shift their existing responsibilities onto others, and secure for them the necessary facilities, training, and security clearances to begin work on the habeas litigation.

6. The Civil Division began converting workspace that had been set aside for the Guantanamo litigation even before our new attorneys began to arrive. Among other things, we needed to secure computers, copiers, and other infrastructure necessary to ensure the lawful and secure handling of classified information, including some sensitive compartmented information subject to particularly stringent handling requirements. Although the workspace can now support most of our expanded litigation team, further modifications and outfitting remain ongoing.

7. To date, DoJ has identified more than 50 attorneys to work on the Guantanamo habeas litigation. These include at least 10 attorneys from within the Federal Programs Branch of the

Civil Division, at least 10 attorneys detailed from other branches of the Civil Division at my direction, and at least 30 attorneys detailed from outside the Civil Division at the direction of the Deputy Attorney General. The first of our detailees arrived in July, and many more arrived throughout August. Once detailees are identified, it may take several weeks for them to obtain the necessary security clearances. Thus, although we now have almost 40 cleared attorneys working full-time on these cases, during the month of August, an average number of approximately 20 cleared attorneys were available. By late September, we expect to have at least 50 cleared attorneys working full-time on these cases.

8. DoJ attorneys are now actively engaged in the preparation of factual returns for the habeas litigation. The preparation of each individual return is a complex and time-consuming process that requires coordination among DoJ, DoD, and various constituents of the Intelligence Community. One important objective in this process is to develop the Government's best possible case to support the detention of each petitioner as an enemy combatant. However, because much of the relevant evidence is classified and extremely sensitive, another competing objective is to minimize the risk of harm from the disclosure of such information. Striking the appropriate balance between these objectives requires difficult, case-by-case and document-by-document judgments regarding the sensitivity of the particular classified document at issue, and the comparative strength of the draft factual return with and without the document.

9. In crafting a proposed factual return, DoJ and DoD attorneys begin by analyzing information about a detainee and by reviewing documents for information that supports the detention (or that is exculpatory, as we understand that term in this context). They then draft a narrative that summarizes the case for detaining the petitioner as an enemy combatant, with appropriate citations to the underlying documents. The creation of a draft factual return,

including the narrative and its supporting documents, consumes dozens of hours and involves review of hundreds of pages of documents, and sometimes far more. Collectively, DoJ and DoD attorneys have expended thousands of hours in developing these draft returns over the past two months.

10. Once a proposed factual return has been drafted, DoJ attorneys then must secure permission to include any classified information in the return from the agency with control over the information at issue. Some of that classified information comes from DoD or the FBI, but the majority of it comes from the Central Intelligence Agency ("CIA").

11. Final decisions about the contents of a factual return thus cannot be made until the intelligence agencies, including the CIA, complete their review of the draft return. If an intelligence agency refuses permission to use a key classified document included in the draft return, DoJ attorneys must then re-evaluate the case, attempt to identify other sources of the information, and determine an appropriate course of action. Sometimes, such a course of action might involve submitting a return that is less compelling than it otherwise might have been. Sometimes, it might involve asking the intelligence agency to re-assess its refusal in light of the critical nature of the particular document to the particular case. Sometimes, in extreme circumstances, it might involve abandoning our defense of a case.

12. To expedite the document clearance process, DoJ and DoD began sending exhibit lists to the CIA in late July and early August. These lists indicated documents for possible inclusion in individual draft returns. Shortly thereafter, on or about August 12, DoJ started to send complete packets of draft factual returns on a rolling basis to the CIA for clearance. To date, DoJ has completed, and sent to the CIA for clearance, 59 of these draft factual returns.

13. This Court's deadline of 50 filed returns by today approximates the proposal made in my June 30, 2008 letter to Chief Judge Lamberth and Judge Hogan, in which the Civil Division proposed to file 50 returns within 60 days of that letter. That proposal assumed (erroneously, as things turned out) that the clearance process would take a matter of days per return. Based on the CIA's experience with the first several returns already filed by the Government, and for reasons explained at length in the public and ex parte declarations of General Hayden, the CIA has now determined that it needs 30 days per return to complete the clearance process without unacceptably compromising classified information and national security. I apologize that our original proposal failed to anticipate the extent of difficulties in securing the necessary clearances for relying upon classified documents.

14. Given the DoJ resources presently in place, I am confident that DoJ will be able to generate, in addition to the 59 draft factual returns that it has already sent to the CIA for clearance review or completed and filed in Court, additional draft returns at the rate of 50 per month. Moreover, according to the public declaration of General Hayden, the CIA now believes that it can make clearance decisions on 50 draft returns per month, provided that it has 30 days per return. For these reasons, I expect that the Government will be able to produce its first 50 factual returns, including those filed today, on a rolling basis before the end of September, and hope it will sustain a similar rate of production each month thereafter.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 29, 2008.

_____
GREGORY G. KATSAS